UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BW FLEET MANAGEMENT PTE LTD, HAFNIA POOLS PTE LTD, and BW ALDRICH PTE LTD as the operator/manager, charterer, and/or registered owner of the M/V HAFNIA RHINE | * * * * * * * * | CIVIL ACTION NO.  SECTION " " ( )  JUDGE  MAGISTRATE |
| VERSUS | * * | |
| TUG JUSTICE and BARGE PBL 3010, *in rem* AND KIRBY INLAND MARINE, LP, *in personam* | * * * * | |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, BW Fleet Management PTE LTD ("BW Fleet"), as operator/manager of the M/T HAFNIA RHINE, Hafnia Pools Pte Ltd ("Hafnia Pools") as the bare boat charterer of the M/T HAFNIA RHINE; and BW Aldrich Pte Ltd ("BW Aldrich") as the Registered Owner of the M/T HAFNIA RHINE (collectively, the "Hafnia Interests") and for their complaint against the Tugboat JUSTICE (IMO No. 9576571) and Barge PBL 3010, their engines, tackle, equipment, and appurtenances, etc. *in rem*, and Kirby Inland Marine, L.P. ("Kirby"), *in personam*, in a cause of action for oil spill response costs, fines, penalties, and damages, civil and maritime, alleges upon information and belief as follows:

### JURISDICTION AND VENUE

1.      This is an action for damages, clean-up costs, expenses, claims, and reimbursements occasioned and incurred following the discharge of bunker fuel into the Mississippi River.

#5011480v1

2. This is a claim within this Honorable Court's admiralty and maritime jurisdiction, pursuant to Art. II, §2 of the U.S. Constitution, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure and the Supplemental Admiralty and Maritime Rules of the Federal Rules of Civil Procedure.

3. This matter is governed in whole or in part by the Oil Pollution Act of 1990, 33 U.S.C. ch. 40 § 2701 et seq. ("OPA"), General Maritime Law, and/or Louisiana State law. This Court has supplemental jurisdiction over all claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District in accordance with Rule C and 28 U.S.C. § 1391 and because the actions of Defendant's vessels, crew, and/or negligence sued upon, occurred in this District.

## THE PARTIES

5. At all material times, Plaintiff, **BW Fleet** is and was a company headquartered in Singapore and is/was the operator/manager of the M/T HAFNIA RHINE (the "HAFNIA RHINE" or "vessel"), an oil product tanker bearing IMO No. 9341940 and MMSI 566902000, and sailing under the flag of Singapore.

6. At all material times, Plaintiff, **Hafnia Pools** is and was a company headquartered in Singapore and is/was the bare boat charterer of the M/T HAFNIA RHINE.

7. At all material times, Plaintiff, **BW Aldrich** is and was a company headquartered in Bermuda and is/was the registered owner of the M/T HAFNIA RHINE.

8. At all material times, *in rem* Defendant, Tugboat JUSTICE (the "tug" or "JUSTICE"), is a tugboat sailing under the flag of the United States of America, owned or operated by Kirby, bearing IMO No. 9576571 and MMSI 367513010, approximately 29.87 meters in length, 10.97 meters in width, and 437 MT DWT.

9. At all material times, *in rem* Defendant, barge PBL 3010 (the "bunker barge" or "PBL 3010"), is a barge of approximately 297.5 feet in length, 54 feet in width, 3271 MT DWT, with a capacity of 28720 MT, and owned or operated by Kirby.

10. At all material times, *in personam* Defendant, Kirby Inland Marine, L.P. ("Kirby") is a non-Louisiana partnership, organized, created, and existing pursuant to the laws of Delaware, with its principal place of business in Houston, Texas, registered to do and doing business in the State of Louisiana, and at all relevant times, is and was the owner, operator, manager, and/or charterer of the JUSTICE and PBL 3010.

## FACTS AND CLAIMS

11. On or about 28 July 2022, the HAFNIA RHINE arrived in AMA Anchorage, located between miles 115 and 117 on the lower Mississippi River.

12. Kirby entered into a contract to supply 700 metric tons ("MT") of very low Sulphur fuel oil ("VLSFO") and 270 MT of Marine Gasoil ("MGO") to the HAFNIA RHINE.

13. The Captain of the HAFNIA RHINE was informed that the vessel would receive bunker fuel, with a nominated amount of 700 MT of VLSFO and 270 MT MGO.

14. On 28 July 2022, the JUSTICE and PBL 3010 moored alongside the HAFNIA RHINE to deliver the nominated amount of bunkers.

15. Upon information and belief, the crew of the JUSTICE and PBL 3010 were Kirby employees or otherwise under Kirby's control.

16. Prior to the transfer, the chief engineer and crew of the HAFNIA RHINE conducted a pre-transfer conference with the tankerman aboard the PBL 3010.

17. During the pre-transfer conference, the chief engineer exchanged documents and communicated with the tankerman and/or crew of the PBL 3010 regarding the nominated

amount, transfer rates, means of communication between barge and vessel, and bunkering procedure.

18. The tankerman and/or crew of the PBL 3010 confirmed that they would only pump 700 MT of VLSFO, as agreed, and set forth in the pre-transfer documents.

19. The tankerman and/or crew of the PBL 3010 confirmed that they would pump bunkers at the agreed flow rate, as set forth in the pre-transfer documents.

20. During the pre-transfer conference, the tankerman and/or crew of the PBL 3010 provided the HAFNIA RHINE a radio, informed the vessel that the only means of communication with the bunker barge was the radio, and advised the vessel crew to keep the radio outside of the vessel structure, as it had limited range.

21. The tankerman and/or crew of the PBL 3010 provided no other means of communication with the bunker barge.

22. Following the pre-transfer conference, the chief engineer and crew of the HAFNIA RHINE prepared the vessel for the transfer and confirmed that all equipment and gear was functioning and ready to receive the bunkers.

23. During the transfer of bunkers, the vessel positioned one crew member at the vessel's manifold, where the PBL 3010's lines attached to the vessel, the fourth engineer at the sounding pipe to take ullages, and the Chief Engineer in the cargo control room.

24. During a transfer of bunkers, the bunker barge controls the flow rate, pressure, and quantity, using pumps aboard the bunker barge. The vessel has no direct means to control the flow rate, pressure, or quantity.

25. Upon information and belief, the PBL 3010 was equipped with a flow meter, gauges, and/or a means of direct sounding that provided information to the tankerman regarding flow rate, pressure, and total quantity of VLSFO being transferred.

26. The PBL 3010 and JUSTICE were working together as a flotilla or single unit.

27. The PBL 3010 is unable to independently maneuver and relies on the JUSTICE for movement, steering, positioning, and communication with other vessels.

28. The JUSTICE remained alongside the HAFNIA RHINE and attached to the PBL 3010 throughout the bunker transfer.

29. Once the vessel personnel were in position, the vessel radioed to the PBL 3010 with the radio provided by the barge and informed the tankerman that the vessel was prepared to receive bunkers.

30. The PBL 3010 proceeded to pump the nominated amount of the first bunker, the MGO. The MGO was transferred to the vessel without issue and the PBL 3010 did not exceed the nominated amount, with 267 MT provided of the nominated 270 MT.

31. Following the MGO bunker transfer, the vessel prepared to receive the VLSFO and the PBL 3010 subsequently began pumping the bunker fuel into the HAFNIA RHINE's starboard bunker tank.

32. During the transfer of VLSFO, the fourth engineer took regular soundings at the starboard sounding pipe and relayed ullages to the Chief Engineer.

33. The Chief Engineer recorded the ullages and calculated approximate flow rate and total amount pumped by the PBL 3010.

34. At approximately 1705, the Chief Engineer's calculations showed that the PBL 3010 had transferred 683 MT of the 700 MT VLSFO nominated amount.

35. The Chief Engineer instructed the Fourth Engineer to use the radio provided by the bunker barge to contact the tankerman to re-confirm that they were only providing 700 MT and confirm when they were going to stop pumping.

36. The Fourth Engineer contacted the tankerman who confirmed they were only pumping 700 MT and that they would stop pumping shortly.

37. Thereafter, the Chief Engineer proceeded to the vessel deck to oversee the conclusion of the bunker transfer process.

38. As the Chief Engineer exited the accommodation structure to proceed onto the deck, he saw bunker fuel overflowing from the starboard air vent for the bunker tank (the "incident") because the PBL 3010 had overfilled the bunker tanks.

39. The vessel crew acted immediately to contain and collect the bunker fuel which had spilled on the deck of the vessel.

40. Despite timely and professional action by the vessel crew, an unknown quantity of VLSFO spilled onto the vessel's deck, passed over the side plate, spilled down her side, and into the Mississippi River (the "discharge").

41. Following the incident, the tankerman aboard the PBL 3010 provided a bunker delivery note ("BDN") showing that the PBL 3010 had pumped 802.79 MT of VLSFO, 102.19 MT above the nominated amount agreed prior to the transfer.

42. As a result of the spill, the Hafnia Interests, incurred costs, damages, expenses for clean-up, internal expense and time spent responding to the incident, reimbursement of third party costs and fees, including those of Legacy Inc, ES&H, Port Ship Services, National Response Corporation, Witts Obrien, and the United States Coast Guard and other expenses exceeding $5,500,000.00  (FIVE MILLION AND FIVE HUNDRED THOUSAND)  and faces a

claim from ARTCO, for alleged clean up, tug/vessel/barge expense and lost profits or loss of use, in the amount of at least $630,00.000 (SIX HUNDRED AND THIRTY THOUSAND) whose barges were fleeted in the vicinity and allegedly were soiled by the spill, and other as yet unknown potential claims and expenses. Plaintiffs reserve the right to amend and/or supplement this article of the clams as the facts become more fully known and/or additional costs, fees, or fines are incurred.

## FIRST CAUSE OF ACTION

### (Negligence and Unseaworthiness)

43. Plaintiffs reiterate and re-aver the allegations of Paragraphs 1 through 44 of this Complaint.

44. The discharge and incident were caused by over-pumping, in excess of the agreed nominated amount, of VLSFO by the JUSTICE, PBL 3010, and/or their owners, operators, managers, crew, captain, charterers and/or agents, and/or Kirby and its employees, contractors, or operators.

45. The aforementioned Incident was in no way attributable to any fault, negligence or want of care on the part of plaintiffs or the HAFNIA RHINE, but rather was the result of, and caused by the sole or partial fault, negligence, unseaworthiness, and/or want of care of the JUSTICE, PBL 3010, and/or their owners, operators, managers, crew, captain, charterers and/or agents, and/or Kirby and its employees, contractors, or operators, in the following non-exhaustive respects:

    a. By providing an amount of VLSFO bunker fuel in excess of the nominated amount agreed by the parties prior to transfer;

    b. By failing to monitor, or monitor adequately, the rate of flow of the bunker;

c. By failing to reduce the rate of flow in a timely and prudent manner;

d. By failing to comply with the transfer procedures agreed during the pre-transfer conference.

e. By disregarding the applicable rules for conducting bunkering operations;

f. By manning the PBL 3010 with careless, incompetent, and inattentive persons;

g. By failing to maintain and monitor the barge and JUSTICE's condition;

h. By failing to use due care under the circumstances;

i. By failing to take appropriate corrective actions;

j. By failing to properly inspect and maintain the barge, tug, and bunker fuel;

k. By failing to properly load, stow, secure and discharge the bunker fuel to the vessel;

l. By failing to deliver the nominated amount of bunker fuel as agreed prior to, and as reconfirmed during, the transfer;

m. By failing to maintain the PBL 3010 in a seaworthy state;

n. By failing to train and/or supervise the crew or tankerman of the PBL 3010;

o. By failing to reasonably ensure safe transfer of bunker fuel;

p. By failing to maintain effective communication with the vessel during the bunker transfer;

q. By providing inadequate and/or defective equipment and/or information, including pumps, gauges, readings, and the radio for use during the transfer and/or gauges, pumps, and lines on the PBL 3010;

r. By failing to monitor, oversee, intervene, stop and/or correct the excessive discharge of the bunker fuel;

    s. By failure to exercise due care, misinformation, and/or reckless and gross negligence; and

    t. Any and all acts of negligence, fault, statutory violations and/or lack of due care, to be proven at trial.

46. The discharge would not have occurred but for the negligence of the JUSTICE, PBL 3010, and/or their owners, operators, managers, crew, captain, charterers and/or agents, and/or Kirby and its employees, contractors, or operators, who were the proximate cause of the discharge.

47. As a result of the sole or partial fault, negligence, unseaworthiness, and/or want of care of defendants, plaintiffs have incurred damages totaling approximately $5,500,000.00 (FIVE MILLION AND FIVE HUNDRED THOUSAND US DOLLARS) and may face claims amounts, expense, and fines of $1,000,000.00 (ONE MILLION) or more, for a total presently estimated at $6,500,000.00 (SIX MILLION AND FIVE HUNDRED THOUSAND US DOLLARS).

48. The Hafnia Interests reserve the right to amend and supplement this article of the complaint and to specify such other and/or different faults and acts of negligent, or items of damage, as may become evident in the development of further facts.

## SECOND CAUSE OF ACTION

## (OPA)

49. Plaintiffs reiterate and re-aver the allegations of Paragraphs 1 through 50 of this Complaint.

50. The Hafnia Rhine, as the immediate source of the discharge, was statutorily designated as the Responsible Party under OPA, without any finding of fault, negligence, causation, or want of due care.

51. The HAFNIA RHINE and/or the Hafnia Interests remunerated oil spill removal costs, natural resources damages, and third-party damages caused by the discharge.

52. Cleanup and removal costs, exclusive of any ARTCO claim, total FIVE MILLION AND FIVE HUNDRED THOUSAND US DOLLARS ($5,500,000.00).

53. In order to ensure the safety of the community, protection of the environment, and to avoid damage to third parties, the Hafnia Interests and/or the HAFNIA RHINE coordinated efforts to contain and clean-up the spilled bunker fuel.

54. The professional and expeditious action of the Hafnia Interests and/or the Hafnia Rhine avoided and reduced damages and pollution.

55. The Hafnia Interests and/or the Hafnia Rhine incurred costs and fees for clean-up expenses, containment, personnel and equipment, charges, and requests for reimbursement.

56. As the responsible party under OPA, the Hafnia Interests and/or the Hafnia Rhine paid or reimbursed third party clean-up costs, fees, and costs associated with the incident.

57. OPA provides the responsible party with causes of action for subrogation, contribution, and/or indemnity for clean-up costs, expenses, and damages sustained or paid by the responsible party, including those incurred by third parties and paid by the responsible party.

58. Pursuant to OPA, the Hafnia Interests and/or the Hafnia Rhine, assert subrogation rights for the amounts incurred by third parties and paid by the Hafnia Interests, to the extent the discharge was caused solely or partially by an act or omission of the JUSTICE, PBL 3010, and/or their owners, operators, managers, crew, captain, charterers and/or agents, and/or Kirby and its employees, contractors, or operators.

59. Pursuant to OPA, the Hafnia Interests and/or the Hafnia Rhine demand contribution and indemnity for costs, damages, and other fees incurred by them due to the fault, negligence, unseaworthiness, and/or want of care of the JUSTICE, PBL 3010, and/or their owners, operators, managers, crew, captain, charterers and/or agents, and/or Kirby and its employees, contractors, or operators.

60. The Hafnia Interests and/or the Hafnia Rhine reserve the right to amend this complaint to include any additional *in personam*, *in rem*, Rule B or *quasi in rem* claims as may become available after further investigation and/or discovery;

61. All and singular the matters aforesaid are true and correct.

WHEREFORE, BW FLEET MANAGEMENT PTE LTD, HAFNIA POOLS PTE LTD, and BW ALDRICH PTE LTD as the operator/manager, charterer, and/or registered owner of the M/V HAFNIA RHINE pray:

> (1) That defendants be served with copies of this Complaint, together with summonses to appear and answer under oath all and singular the matters aforesaid.
>
> (2) That the Court order, adjudge, and decree that defendants, the Tugboat JUSTICE (IMO No. 9576571) and Barge PBL 3010, their engines, tackle, equipment, and

appurtenances, etc. *in rem*, and Kirby Inland Marine, L.P. ("Kirby"), *in personam* pay BW FLEET MANAGEMENT PTE LTD, HAFNIA POOLS PTE LTD, and BW ALDRICH PTE LTD the damages, losses, costs, fees, and fine sustained by them, together with interests thereon and its costs and disbursements; and

(3) That the Court grant such other and further relief as may be just in the circumstances.

Respectfully submitted,

*/s/ Derek A. Walker*
DEREK A. WALKER
ALEXANDER J. DEGIULIO
**CHAFFE McCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone: (504) 585-7000
Facsimile: (504) 585-7075
Email: walkerd@chaffe.com
Email*:* alex.degiulio@chaffe.com
*Attorneys for BW FLEET MANAGEMENT PTE LTD, HAFNIA POOLS PTE LTD, and BW ALDRICH PTE LTD as the operator/manager, charterer, and/or registered owner of the M/V HAFNIA RHINE*

**Please Hold Service**

#5011480v1

12